IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 2:11-cv-02958-RMG |
| v. | ) |
| | ) |
| STATE OF SOUTH CAROLINA and | ) |
| NIKKI R. HALEY, in her official capacity | ) |
| as the Governor of South Carolina, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The United States of America, the plaintiff herein, respectfully alleges:

## NATURE OF THE ACTION

1.  In this action, the United States seeks to declare invalid and enjoin the enforcement of certain provisions of Act No. 69, as enacted by the State of South Carolina on June 27, 2011, because such provisions are preempted by federal law and therefore violate the Supremacy Clause of the United States Constitution.

2.  In our constitutional system, the federal government has preeminent authority to regulate immigration matters and to conduct foreign relations. This authority derives from the Constitution and numerous acts of Congress. The nation's immigration laws reflect a careful and considered balance of national law enforcement, foreign relations, and humanitarian interests. Congress has assigned to the United States Department of Homeland Security, the Department of Justice, and the Department of State, along with other federal agencies, the enforcement and administration of these immigration-related laws. In administering these laws, the federal agencies balance the complex – and often competing – objectives that animate federal

immigration law and policy.  Although States may exercise their police power in a manner that has an incidental or indirect effect on aliens, a State may not establish its own immigration policy or enforce state laws in a manner that interferes with federal immigration laws.  The Constitution and the federal immigration laws do not permit the development of a patchwork of disparate state and local immigration policies throughout the country.

3.  Despite the preeminent federal authority and responsibility over immigration and foreign relations, the State of South Carolina recently enacted Act No. 69, which addresses multiple aspects of immigration regulation and enforcement and is scheduled to become effective on January 1, 2012.  The provisions of Act No. 69, working individually and in concert, seek to punish unlawful entry and presence of aliens such as by requiring, whenever practicable, a determination of immigration status during any lawful stop, detention, investigation, or arrest by the police where there is "reasonable suspicion" that an individual is unlawfully present, and by establishing new state criminal sanctions against unlawfully present aliens.  The mandate to enforce Act No. 69 is reinforced by a provision allowing a resident of any political subdivision of South Carolina to file suit against any such subdivision that enacts "any ordinance or policy that intentionally limits or prohibits a law enforcement officer, local official, or local government employee from seeking to enforce a state law with regard to immigration" (Section 1).  Any political subdivision held liable under this provision faces civil penalties between $1,000 and $5,000 "for each day that the enactment, action, policy, or practice remains or remained in effect."

4.  Act No. 69 requires state and local officers and officials to take certain actions in relation to aliens without regard to the objectives that Congress has established for the federal immigration system.  This failure to abide by the interests animating federal immigration law

provides sufficient reason that Act No. 69 is preempted. But just as importantly, even where South Carolina appears to pursue a goal of the federal system, it does so in a way that disregards federal priorities, thereby necessarily resulting in a disruption of federal enforcement and a burden on resources that focus on aliens who pose a threat to national security or public safety.

5. If allowed to go into effect, Act No. 69's enforcement scheme will conflict with and undermine the federal government's careful balance of immigration enforcement priorities and objectives. For example, it will impose significant and counterproductive burdens on the federal agencies charged with enforcing the national immigration scheme, diverting resources and attention from the dangerous aliens whom the federal government targets as its top enforcement priority. It will cause the detention and harassment of authorized visitors, immigrants, and citizens who do not have or carry identification documents specified by the statute, or who otherwise will be swept within Act No. 69's rigid approach of universal, undifferentiated enforcement. It will conflict with longstanding federal law governing the registration and movement of aliens. It will undermine federal law and invade federal authority by imposing punitive sanctions for conduct that falls outside of the State's police powers and that Congress affirmatively decided should not be subject to such sanctions. And it will interfere with and undermine the federal government's control over relations with foreign governments.

6. The United States understands the State of South Carolina's legitimate concerns about illegal immigration, and has undertaken significant efforts both to secure our nation's borders and to address the problems created by unlawfully present aliens. The federal government, moreover, welcomes cooperative efforts by States and localities to aid in the enforcement of the nation's immigration laws. But the United States Constitution forbids South Carolina from supplanting the federal government's immigration regime with its own State-specific immigra-

3

tion policy – a policy that, in purpose and effect, interferes with the numerous interests the federal government must balance when enforcing and administering the immigration laws and disrupts the balance actually established by the federal government.  Accordingly, and as set forth below, Act No. 69 is invalid under the Supremacy Clause of the United States Constitution and must be declared unconstitutional and enjoined.

## JURISDICTION AND VENUE

7.  This action arises under the Constitution of the United States, Article VI, Clause 2, and Article I, Section 8, and the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

8.  Venue lies in the District of South Carolina pursuant to 28 U.S.C. § 1391(b), and in the Charleston Division pursuant to Local Civil Rule 3.01(A)(1).  Defendants are the State of South Carolina and the Governor of South Carolina, who resides in the State.  A substantial part of the events or omissions giving rise to the claims in this action occurred in South Carolina, and the defendants do business in this Division relating to the events or omissions alleged herein.

## PARTIES

9.  The United States of America is the plaintiff in this action, suing on its own behalf, as well as on behalf of the United States Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of State.

10.  DHS is an executive department of the United States.  *See* Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002).  DHS is responsible for the administration and enforcement of laws relating to immigration, as well as the investigation of immigration crimes and protection of the United States border against the illegal entry of aliens.  See 8 U.S.C.

4

§ 1103. DHS is also responsible for providing citizenship and immigration services through U.S. Citizenship and Immigration Services.

11. DOJ is an executive department of the United States. *See* Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870). The Attorney General, as the head of DOJ, shares certain immigration-related responsibilities with the Secretary of Homeland Security, and he may, among his various immigration functions, order aliens removed from the United States and order the cancellation of removal. *See, e.g.*, 8 U.S.C. §§ 1103, 1158, 1182, 1227, 1229a, 1229b.

12. The Department of State is an executive department of the United States. *See* State Department Basic Authorities Act of 1956, Pub. L. No. 84-885, as amended; 22 U.S.C. §§ 2651 *et seq.* The Department of State manages the foreign affairs of the United States under the direction of the President, and is partially responsible for administering certain aspects of the federal immigration laws, including but not limited to the administration of visas.

13. Defendant, the State of South Carolina, is a State of the United States that entered the Union as the eighth State in 1788.

14. Defendant, Governor Nikki R. Haley, is the Governor of South Carolina, and is being sued in her official capacity.

**FACTUAL ALLEGATIONS**

**Federal Authority and Law Governing Immigration and the Status of Aliens**

15. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

5

16.  The Constitution affords the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const., art. I, § 8, cl. 3.  Further, the federal government has broad authority to establish the terms and conditions for the entry and continued presence of aliens in the United States, and to regulate the status of aliens within the boundaries of the United States.

17.  The Constitution affords the President of the United States the authority to "take Care that the Laws be faithfully executed."  U.S. Const., art. II, § 3.  Further, the President has broad authority over foreign affairs.  The establishment and implementation of policies toward other countries are exclusively reserved for the federal government, and the treatment of immigrants from other countries is inextricably tied up with foreign policy.  Immigration law, policy, and enforcement priorities are affected by and impact U.S. foreign policy, and are themselves the subject of diplomatic arrangements.

18.  Congress has exercised its authority to make laws governing immigration and the status of aliens within the United States by enacting the various provisions of the Immigration and Nationality Act and other laws regulating immigration.  Through the INA, Congress set forth the framework by which the federal government determines which aliens may be eligible to enter and reside in the United States, which aliens may be removed from the United States, the consequences of unlawful presence, the penalties on persons who violate the procedures established for entry, the conditions of residence, and the employment of aliens, as well as the process by which certain aliens may ultimately become naturalized citizens of the United States.  *See* 8 U.S.C. §§ 1101 *et seq.*  The INA also vests the executive branch with considerable discretion in enforcing the provisions of federal immigration laws, generally allowing federal agencies to ultimately decide whether particular immigration remedies are appropriate in individual cases.

6

19.  In exercising its significant enforcement discretion regarding aliens and immigration, the federal government prioritizes for arrest, detention, prosecution, and removal those aliens who pose a danger to national security or a risk to public safety.  Consistent with these enforcement priorities, the federal government targets aliens engaged in or suspected of terrorism or espionage; aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; certain gang members; aliens subject to outstanding criminal warrants; and fugitive aliens, especially those with criminal records.

20.  In crafting federal immigration law and policy, Congress has necessarily taken into account multiple and often competing national interests.  Ensuring effective enforcement of the provisions against illegal immigration and unlawful presence is a highly important interest, but it is not the singular goal of the federal immigration laws.  The laws also take into account other uniquely national interests, including facilitating trade and commerce; welcoming those foreign nationals who visit or immigrate lawfully and ensuring their fair and equitable treatment wherever they may reside; responding to humanitarian concerns at the global and individual levels; and otherwise ensuring that the treatment of aliens present in our nation does not harm our foreign relations with the countries from which they come or jeopardize the treatment of U.S. citizens abroad.  Because immigration control and management is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *United States* ex rel. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal citations omitted), Congress vested substantial discretion in the President and the administering federal agencies to adjust the balance of these multiple interests as appropriate – both globally and in individual cases.

21.  Congress has tasked DHS and DOJ with overseeing significant portions of the United States' immigration interests, and has provided each with specific powers to promote the various goals of the federal immigration scheme and to enforce the federal immigration authority under the INA.  *See* 8 U.S.C. § 1103.  The Department of State is also empowered by the INA to administer aspects of the federal immigration laws, including visa programs.  *See, e.g.*, *id.* § 1104.  DHS may generally order an alien immediately removed where the alien either fails to present the appropriate documentation or commits fraud at the time of the alien's inspection. DHS may also place an alien into removal proceedings, and may ultimately remove an alien who entered the United States unlawfully or violated the conditions of admission.  *See id.* §§ 1182, 1225, 1227, 1228(b), 1229, 1229a, 1231.  DOJ may order an alien removed for any of several reasons, including if the alien has stayed in the United States longer than permitted or has engaged in certain unlawful conduct.  *See id*. §§ 1227, 1229a.  In addition to removal, the statute authorizes DHS and DOJ to employ civil and criminal sanctions against an alien for immigration violations, such as unlawful entry, failing to properly register with the federal government, and document fraud.  *See, e.g.*, *id.* §§ 1325, 1306, 1324c.  However, in the exercise of discretion, the administering agencies may decide not to apply a specific sanction and may, among other steps, permit the alien to depart the country voluntarily at his or her own expense and may even decide not to pursue removal of the alien if deferred federal enforcement will serve some other goal of the immigration system.  *See id.* § 1229c.

22.  Under federal law, both DHS and DOJ may, for humanitarian or other reasons, decline to exercise certain immigration sanctions or grant an otherwise unlawfully present or removable alien an immigration benefit – and potentially adjust that alien's immigration status – if the alien meets certain conditions.  *See, e.g.*, 8 U.S.C. § 1158 (providing asylum eligibility for

8

aliens who have a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, if removed); *id.* § 1254a (providing temporary protected status for otherwise eligible nationals of a foreign state that the Secretary of Homeland Security has specially designated as undergoing armed conflict, a natural disaster, or other extraordinary circumstance); *id.* § 1227(a)(1)(E)(iii) (providing discretion to waive grounds for deportability "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest" for aliens who are otherwise deportable for encouraging unlawful entry of an immediate family member); *id.* § 1229b (granting the Attorney General discretion to cancel removal for certain aliens).  DHS also has the authority to permit aliens, including those who would be inadmissible, to temporarily enter the United States for "urgent humanitarian reasons" or "significant public benefit."  *Id.* § 1182(d)(5).  DHS may also refrain from enforcement actions, in appropriate circumstances, against persons unlawfully present in the United States. *See* 8 C.F.R. § 274a.12(c)(14) (discussing deferred action).

23.  In light of these statutory provisions, DHS and DOJ exercise discretion with respect to, among other things, whether to allow an unlawfully present alien to voluntarily depart, whether to place an alien into removal proceedings, whether to impose criminal sanctions on an alien who has committed an immigration violation, whether to allow an unlawfully present alien to remain in the country without physical detention in certain circumstances, and whether to grant an alien humanitarian or some other form of relief.  Decisions to forego removal or criminal penalties result not only from resource constraints, but also from affirmative policy considerations – including humanitarian and foreign policy interests – established by Congress and balanced by the executive branch.

24.  Congress, which holds exclusive authority for establishing alien status categories and the consequences thereof and for setting the conditions of aliens' entry and continued presence, has affirmatively decided that unlawful presence – standing alone – should not subject an alien to criminal penalties, incarceration, or other punitive measures, although unlawful presence may subject the alien to the civil remedy of removal.  *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(B) & (C).  Unlawful presence becomes an element of a criminal offense, however, when an alien is found in the United States after having been previously removed or after voluntarily departing from the United States while a removal order was pending.  *See id.* § 1326.  Further, unlawful entry into the United States is a criminal offense.  S*ee id.* § 1325.  Congress has specifically authorized federal immigration officers to patrol the United States border, as well as to search vehicles and lands near the border, to prevent aliens from unlawfully entering the United States, and it has empowered those officers to arrest an alien who is seen attempting unlawful entry at the border or who the officer has reason to believe has unlawfully entered the county and is likely to escape before a warrant can be obtained.  *See id.* § 1357.

25.  Congress has also created a comprehensive alien registration system for monitoring the entry and movement of aliens within the United States.  *See* 8 U.S.C. §§ 1201, 1301-1306; *see also* 8 C.F.R. Part 264 (regulations regarding "Registration and Fingerprinting of Aliens in the United States").  Under this federal alien registration system, aliens seeking to enter the United States, either permanently or temporarily (other than diplomatic and official visitors), must be registered by the Department of State at the time of visa application.  *See* 8 U.S.C. §§ 1201(b), 1301, 1302.  Any alien who is age 14 or over, who has not otherwise been registered and fingerprinted under the INA, and who remains in the United States for 30 days or longer, must apply to be registered and fingerprinted by DHS.  *See id.* § 1302(a).  The INA provides that

any alien who is required to apply for registration and willfully fails to do so may be fined and

imprisoned not more than six months. *See id*. § 1306(a); 18 U.S.C. § 3571. Aliens are required

to report their change of address to DHS within ten days of such change. *See* 8 U.S.C. § 1305.

26. As part of this federal alien registration system, Congress further specified the

content of the registration forms, *see* 8 U.S.C. § 1303, what special circumstances may require

deviation, *id.*, and the confidential nature of registration information, *see id.* § 1304. Aliens who

are 18 years of age and older are required to carry in their possession their certificate of alien

registration or alien registration receipt card. *See id*. § 1304(e). The INA provides that any alien

who fails to comply with this requirement may be fined and imprisoned not more than 30 days.

*See id.*; 18 U.S.C. § 3571.

27. However, there are several circumstances in which an alien would not be provided

with evidence of registration notwithstanding the government's knowledge of the alien's

presence. Federal law provides a variety of humanitarian options for aliens – including

unlawfully present aliens – who have been victimized or fear persecution or violence, including

but not limited to asylum, special visas for victims of trafficking, and special visas for victims of

violent crime. In order to qualify for such a program, an alien needs to apply and satisfy the

criteria required by the program. During the pendency of the application process, an alien may

not have evidence of registration even though the federal government is aware of the alien's

presence, has decided against removing the alien, obviously has no interest in prosecuting the

alien for a crime, and may even have affirmatively granted the alien authorization to work in the

United States. These humanitarian programs demonstrate that one aspect of federal immigration

policy is to assist and welcome such victims in the United States, notwithstanding possible

temporary unlawful presence. It would therefore violate federal policy to prosecute or detain

11

these types of aliens for lack of registration papers – which is often known to the federal government and, for affirmative policy reasons, not used as the basis for a removal proceeding or criminal prosecution.

28.  Congress has further exercised its authority over the entry and movement of aliens by criminalizing the smuggling of unlawful aliens into the country, as well as the facilitation of unlawful immigration within the nation's borders.  *See* 8 U.S.C. § 1324.  Specifically, federal law prohibits the knowing attempt to bring an alien into the United States "at a place other than a designated port of entry or place other than as designated by the [Secretary of Homeland Security]," *id.* § 1324(a)(1)(A)(i), and imposes criminal penalties on a person who, "knowing or in reckless disregard" of the fact that an alien has unlawfully entered or remained in the United States, attempts to "transport or move" the alien within the United States "in furtherance of such violation of law."  *Id.* § 1324(a)(1)(A)(ii).  These criminal sanctions are directed at the smuggler and are not meant to serve as a criminal sanction for the unlawfully present alien or for incidental transportation.  Congress chose not to penalize an unlawfully present alien's mere movement within the country or across state lines unless other factors are present, nor do the federal immigration laws penalize the provision of transportation services in such situations.

29.  Federal law also imposes criminal penalties on a person who, "conceals, harbors, or shields from detection," an alien in "knowing or in reckless disregard" of the fact that the alien has unlawfully entered or remained in the United States.  8 U.S.C. § 1324(a)(1)(A)(iii).  Federal law does not, as a general matter, restrict the movement of aliens – whether lawfully or unlawfully present – between different States.  Federal law additionally exempts from certain of these prohibitions religious organizations which "encourage, invite, call, allow, or enable" an alien to

volunteer as a minister or missionary, and which provide the alien with basic living expenses. *Id.* § 1324(a)(1)(C).

30.  DHS is primarily charged with administering and enforcing the INA and other laws relating to immigration, which it accomplishes mainly through its components, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS").  *See* 8 U.S.C. § 1103.  DHS also receives state and local cooperation in its enforcement efforts.  *See id.* § 1357(g).  In addition, Congress prescribed by statute a number of ways in which States may assist the federal government in its enforcement of the immigration laws.  *See, e.g.*, *id.* § 1103(a)(10) (authorizing DHS to empower state or local law enforcement with immigration enforcement authority when an "actual or imminent mass influx of aliens . . . presents urgent circumstances requiring an immediate Federal response"); *id.* § 1357(g)(1) - (9) (authorizing DHS to enter into agreements to provide appropriately trained and supervised state and local officers with the authority to perform functions related to the investigation, apprehension, and detention of aliens); *id.* § 1252c (authorizing state and local law enforcement to arrest aliens who are unlawfully present in the United States and were previously removed after being convicted of a felony in the United States).

31.  Through a variety of programs, DHS works cooperatively with States and localities to accomplish its mission to enforce the federal immigration laws.  ICE administers the Law Enforcement Support Center ("LESC"), which is operational 24 hours a day, 7 days a week, and serves as a national enforcement operations center by – among other responsibilities – promptly providing immigration status and identity information to local, state, and federal law enforcement agencies regarding aliens suspected of, arrested for, or convicted of criminal activity.

Further, ICE and CBP officers respond to requests from state and local law enforcement officers on a variety of immigration matters, including assisting with translation, determining alienage, and evaluating immigration documentation.

32. The opportunity that federal law provides for cooperation by state and local officials does not mean, however, that States can enact their own immigration policies to rival the national immigration policy; the formulation of immigration policy and the balancing of immigration enforcement priorities is a matter reserved for the federal government. Such regulation does not fall within the States' traditional police powers and remains the exclusive province of the federal government.

## South Carolina's Act No. 69

33. On June 27, 2011, Governor Nikki R. Haley signed into law Act No. 69, which contains several provisions designed to work together to discourage and deter the entry into and presence of unlawful aliens in South Carolina through a statute that regulates numerous aspects of these aliens' lives. Indeed, Governor Haley, in signing Act No. 69, said that one purpose of the law is to "make sure" that unlawfully present aliens find "another State to go to." *See* Governor Nikki Haley Signs Illegal Immigration Reform Bill (video recording), *available at* http://www.youtube.com/watch?v=BMZikpA3_8U (uploaded by "nikkihaley").

34. Act No. 69 implements South Carolina's stated immigration policy through a wide-ranging immigration regime that regulates everything from the transportation and harboring of aliens (Section 4), to the carrying of identification and the making or using of false identification (Sections 5, 6, and 15), to the verification of immigration status (Section 6), and other aspects of an alien's presence in the United States. Unlike federal law, for example, Act No. 69 criminalizes an alien's own actions in "allowing" oneself to be transported or in "concealing" or

14

"sheltering" oneself "with intent to" avoid apprehension or detection.  Act No. 69 further expands the opportunities for South Carolina police to discover the commission of these various crimes, and thus to push aliens toward incarceration, by enforcing a mandatory immigration status verification system.

35.  By pursuing retribution and ignoring every other objective embodied in the federal immigration system (including the federal government's prioritization of the removal of criminal aliens), Act No. 69 conflicts with and otherwise stands as an obstacle to Congress's demand for sufficient flexibility in the enforcement of federal immigration law to accommodate the competing interests of immigration control, national security and public safety, humanitarian concerns, and foreign relations – a balance implemented through the supervision and policies of the President and other executive officers with the discretion to enforce federal immigration laws.  *See* 8 U.S.C. §§ 1101 *et seq.*  South Carolina's punitive scheme would further undermine federal foreign policy, in that the federal government has – as a matter of reciprocal, bilateral understandings – established that unlawfully present foreign nationals (who have not committed some other violation of law) should be removed without criminal sanction or other punitive measures and that the same treatment should be afforded to American nationals who are unlawfully present in other countries.  Act No. 69 would thus interfere with federal policy and prerogatives in the enforcement of the U.S. immigration laws and the conduct of foreign affairs.  All of these provisions are backed by a private right of action that ensures a policy of full enforcement by every political subdivision in the State (Section 1).

36.  Act No. 69 attempts to override federal policies and priorities in the area of immigration enforcement and to directly regulate the conditions of an alien's presence in the United States despite the fact that those subjects are federal domains.  South Carolina's adoption

15

of a policy focused exclusively on punishing unlawful presence disrupts the national enforce-

ment regime set forth in the INA and reflected in federal immigration enforcement policy and

practice, including the federal government's prioritization of enforcement against criminal aliens.

Thus, because Act No. 69 attempts to set state-specific immigration policy, it legislates in an area

constitutionally reserved to the federal government, conflicts with federal immigration laws and

policy, and impedes the accomplishment and execution of the full purposes and objectives of

Congress, and is therefore preempted.

37.  Several other States have passed or are contemplating passing legislation similar to

Act No. 69.  The development and implementation of various conflicting state immigration

enforcement policies will result in further and significant damage to (1) U.S. foreign relations,

(2) the United States' ability to fairly and consistently enforce the federal immigration laws and

provide immigration-related humanitarian relief, and (3) the United States' ability to exercise the

discretion vested in the executive branch under the INA, and will result in a patchwork of differ-

ing requirements for unlawfully present aliens and therefore their non-uniform treatment across

the United States.

### Section 4 of Act No. 69

38.  Section 4 of Act No. 69 establishes four criminal offenses related to the transpor-

tation or harboring of "a person who has come to, entered, or remained in the United States in

violation of law" – two offenses involving aliens themselves and two involving persons who

transport or harbor them.  Under Section 4, it is unlawful for an unlawfully present alien, "with

intent to further [his or her] unlawful entry into the United States or avoiding apprehension or

detection of the person's unlawful immigration status," either (1) "to allow [him- or herself] to

be transported, moved, or attempted to be transported within the State or to solicit or conspire to

be transported or moved within the State" or (2) "to conceal, harbor, or shelter [him- or herself] from detection or to solicit or conspire to conceal, harbor, or shelter [him- or herself] from detection . . . ."

39.  In relation to other persons, Section 4 makes it unlawful for a person, "knowingly or in reckless disregard" of the fact that someone is an unlawfully present alien and "with intent to further [the alien's] unlawful entry into the United States or avoiding apprehension or detection of [the alien's] unlawful immigration status," either (1) "to transport, move, or attempt to transport that person within the State or to solicit or conspire to transport or move that person within the State," or (2) "to conceal, harbor, or shelter from detection or to solicit or conspire to conceal, harbor, or shelter from detection that person . . . ."

40.  All of these offenses are felonies, punishable by a fine up to $5,000 and/or imprisonment up to five years.  Section 4 sets forth certain explicit exceptions, including "[p]roviding health care treatment or services to a natural person" and certain programs, such as soup kitchens, that provide certain "in-kind services at the community level."  S.C. Act No. 69 § 4 (amending S.C. Code § 16-9-460).

41.  Congress already regulates numerous aspects of the movement of aliens, including imposing criminal sanctions on persons who unlawfully bring aliens into the United States, 8 U.S.C. § 1323; imposing criminal sanctions on persons who transport unlawfully present aliens in furtherance of their unlawful entry or presence and persons who conceal or harbor such aliens, *id.* § 1324(a); penalizing persons who assist certain inadmissible aliens to enter the country, *id.* § 1327; and penalizing the importation of aliens for immoral purposes, *id.* § 1328.  In short, "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the *conditions* of entry *and residence* of aliens."

17

*Mathews v. Diaz*, 426 U.S. 67, 84-85 (1976) (emphasis added).  Congress indicated what role it saw for the States in this area when it expressly authorized "all . . . officers whose duty it is to enforce criminal laws" to *make arrests* for violation of 8 U.S.C. § 1324.  *See* 8 U.S.C. § 1324(c).

42.  Moreover, unlike the federal statutes in this area, Section 4 sets forth separate offenses expressly directed at aliens, contrary to Congress's decision not to criminalize transportation and harboring activities on the part of aliens themselves.  Further, even aside from these and other textual differences, enforcement of Section 4 will be subject to state decisions regarding prosecutorial discretion and statutory interpretation, which will undermine federal authority to establish immigration enforcement priorities and strategies.  Thus, Section 4 of Act No. 69 conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress in creating a comprehensive system of penalties for the transportation and harboring of unlawfully present aliens.

### Sections 5, 6 (part), and 15 of Act No. 69

43.  Section 5 of Act No. 69 makes it a misdemeanor, punishable by a fine up to $100 and/or imprisonment up to 30 days, "to fail to carry in the person's personal possession any certificate of alien registration or alien registration receipt card issued to the person pursuant to 8 U.S.C. Section 1304 while the person is in this State."  S.C. Act No. 69 § 5 (adding S.C. Code § 16-17-750).

44.  Section 6 of Act No. 69, in part, makes it a criminal offense to display or possess a false picture identification "for the purpose of offering proof of the person's lawful presence in the United States."  A first offense is a misdemeanor punishable by a fine up to $100 or imprisonment up to 30 days, and each subsequent offense is a felony punishable by a fine up to

$500 or imprisonment up to five years.  S.C. Act No. 69 § 6 (adding S.C. Code § 17-13-170(A)(2)).

45.  Section 15 of Act No. 69 makes it a felony "to make, issue, or sell, or offer to make, issue, or sell, a false, fictitious, fraudulent, or counterfeit picture identification that is for use by an alien who is unlawfully present in the United States."  Violation is punishable by a fine up to $25,000 and/or imprisonment up to five years.  S.C. Act No. 69 § 15 (adding S.C. Code § 16-13-480).

46.  Congress has created an extensive scheme for monitoring the entry and movement of aliens within the United States – that is, a comprehensive alien registration system.  Congress has spoken in very specific terms regarding which aliens must register, *see* 8 U.S.C. §§ 1201, 1301, when they must register, *id.* § 1302, the content of the registration forms and what special circumstances may require deviation, *id.* § 1303, the confidential nature of registration information, *id.* § 1304, the circumstances under which an alien must possess registration documents after registering and the consequences for failing to do so, *id.*, the circumstances under which a registered alien must report his movement to the government, *id.* § 1305, and the penalties for failing to register or to notify the government of a change in address, *id.* § 1306; *see also* 8 C.F.R. pt. 264 (Registration and Fingerprinting of Aliens in the United States).  "[T]he federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, [and] states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations."  *Hines v. Davidowitz,* 312 U.S. 52, 66-67 (1941); s*ee United States v. Arizona*, 641 F.3d 339, 354-56 (9th

Cir. 2011).  Accordingly, South Carolina's attempt to enter this field by means of these provisions in Act No. 69 is preempted.

47.  Moreover, all three of these South Carolina provisions establish criminal penalties that differ from those imposed by federal law and independent state mechanisms for enforcement, with likely prosecutorial decisions and judicial interpretations differing from those of federal authorities.  Although state authorities may enforce federal immigration laws in cooperation with federal authorities, they must adhere to federal priorities and federal court interpretations in doing so; in contrast, South Carolina's enforcement of its own immigration statutes would not be so constrained, creating the potential for contradictory interpretations and priorities.

### Section 6 of Act No. 69

48.  Other portions of Section 6 of Act No. 69 provide that if a law enforcement officer, in making a stop or arrest or even an investigation "for a criminal offense . . . has reasonable suspicion to believe that the person is unlawfully present in the United States, the officer shall make a reasonable effort, when practicable, to determine whether the person is lawfully present in the United States, unless the determination would hinder or obstruct an investigation."  The person is presumed to be lawfully present if he or she provides a valid driver's license or picture identification issued by South Carolina or another State, a picture ID issued by the United States (including a passport or military identification), or a tribal picture identification.  In absence of such identification, the person "may" still be presumed to be lawfully present "if the officer is able to otherwise verify that the person has been issued any of those forms of picture identification."

49.  If an individual does not meet the presumption set forth in Section 6, the officer "shall make a reasonable effort, when practicable, to verify the person's lawful presence in the United States," either by contacting the State Illegal Immigration Enforcement Unit created by Act No. 69 (Section 17), by "submitting an Immigration Alien Query through the International Justice and Public Safety Network," or by contacting U.S. Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security.  The effort to determine lawful presence may last for "a reasonable amount of time."

50.  The federal government is responsible for "determining what aliens shall be admitted to the United States" and their "registration, documentation [of registration], and possession of [the] proof thereof."  *See Toll v. Moreno*, 458 U.S. 1, 11 (1982) (internal quotation marks omitted); *United States v. Arizona*, 641 F.3d at 355-56; *see also Hines*, 312 U.S. at 66-67. Identifying, detaining, and removing unlawfully present aliens are among the functions of U.S. Immigration and Customs Enforcement.  *See* 8 U.S.C. § 1226; 8 C.F.R. § 236.1.  The efforts of ICE to identify, detain, and remove unlawfully present aliens are focused on – in this order – "[a]liens who pose a danger to national security or a risk to public safety," "[r]ecent illegal entrants," and "[a]liens who are fugitives or otherwise obstruct immigration controls."  *See* Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens (Mar. 2, 2011), *available at* http://www.ice.gov/news/releases/1103/110302washingtondc.htm.

51.  Nevertheless, Congress has set forth certain specific circumstances under which state and local law enforcement officers may assist the federal government in enforcing immigration laws.  For example, under the heading "Performance of immigration officer functions by State officers and employees," an officer or employee of a State or political subdivision may, pursuant to a written agreement with the federal government, "perform a function of an immigration

officer in relation to the investigation, apprehension, or detention of aliens in the United States."
8 U.S.C. § 1357(g)(1).  In doing so, however, "an officer or employee of a State or political
subdivision of a State shall be subject to the direction and supervision" of federal officials.  *Id.*
§ 1357(g)(3).  Even without a written agreement, a state or local officer may "otherwise . . .
*cooperate* with the Attorney General in the identification, apprehension, detention, or removal of
aliens not lawfully present in the United States."  *Id.* § 1357(g)(10)(B) (emphasis added).  But
any systematic efforts by state and local governments to identify, apprehend, and detain aliens
must be carried out in cooperation with the responsible federal officials, and "in a manner that
maintains the ability to conform to the policies and priorities of [the Department of Homeland
Security] and that ensures that individual state and local officers are at all times in a position to
be – and, when requested, are in fact – responsive to the direction and guidance of federal
officials."  *See* Guidance on State and Local Governments' Assistance in Immigration
Enforcement and Related Matters, *available at* http://www.dhs.gov/files/resources/guidance-
state-local-assistance-immigration-enforcement.shtm.

52.  Accordingly, Section 6 of Act No. 69 is preempted in at least three respects.  First,
given that Congress has clearly expressed its intent that state and local government officers may
participate in identifying and apprehending unlawfully present aliens only in cooperation with
federal officials, a state law that systematically requires state and local officers to identify and
apprehend aliens contrary to that intent would be preempted.  Under the mandatory verification
scheme set forth in Section 6, however, all law enforcement officers in South Carolina must
attempt to determine the immigration status of every person who is stopped, detained,
investigated, or arrested for any "criminal offense" when "reasonable suspicion" of unlawful
presence exists.  The statute contains no provision for seeking or adhering to federal guidance

regarding when such a determination is necessary or what constitutes "reasonable suspicion," and no acknowledgment of the federal government's focus on aliens who pose a danger or risk to public safety.

53.  Second, Section 6 will significantly increase the submission of immigration verification requests to the federal government by presumptively requiring a determination of immigration status every time an officer "stops, detains, investigates, or arrests a person for a criminal offense" and has "reasonable suspicion" of unlawful presence.  Indeed, Senator Larry Martin, a sponsor of the bill that became Act No. 69, said during a discussion of the bill in the South Carolina Senate Judiciary Committee that he "want[ed] the phones of the federal government to ring off the hook" as a result of the immigration status verifications required by Act No. 69.  *See* Noelle Phillips, *Ford: Mexicans needed to do work others reject*, The State, Feb. 8, 2011, *available at* http://www.thestate.com/2011/02/08/1685334/tougher-immigration-proposal-goes.html.  Section 6 will require DHS to shift resources away from its chosen priorities, given both the sheer number of likely verification requests and the difficulty of differentiating between high and low priority requests.  South Carolina's submission of verification requests for even minor offenses would make it more difficult for DHS to pay timely attention to inquiries related to high-priority or time-sensitive enforcement targets – that is, those who pose a danger to national security or a risk to public safety.

54.  Third, one of the objectives of Congress in immigration enforcement is "to protect the personal liberties of law-abiding aliens" – to protect them from "indiscriminate and repeated interception and interrogation by public officials . . . to leave them free from the possibility of inquisitorial practices and police surveillance."  *Hines*, 312 U.S. at 65-66, 74.  Section 6 of Act No. 69, however, creates a significant risk of harassment of lawfully present aliens and even U.S.

citizens.  In absence of appropriate federal coordination and supervision, "reasonable suspicion" such as to require an immigration check under Act No. 69 could be understood as arising from a person's inability to speak English well, a particular manner of dress, or even certain physical traits – characteristics shared by unlawful aliens, lawful aliens, and citizens.  Further, many categories of aliens may not have documentation indicating that their presence is lawful – such as citizens of countries participating in the Visa Waiver Program or persons who have applied for asylum or temporary protected status, *see* 8 U.S.C. §§ 1158, 1187, 1254a – thus giving rise to "reasonable suspicion" of unlawful presence and requiring further detention for a "reasonable amount of time" while verification occurs.  Indeed, nothing would prevent multiple detentions of the same lawfully present alien.

## **FIRST CAUSE OF ACTION – VIOLATION OF THE SUPREMACY CLAUSE**

55.  Plaintiff incorporates paragraphs 1 through 54 of the Complaint as if fully stated herein.

56.  Sections 4, 5, 6, and 15 of Act No. 69, taken in whole and in part, represent an impermissible effort by South Carolina to establish its own immigration policy and to directly regulate the immigration status of aliens.  In particular, these sections conflict with federal law and foreign policy, disregard federal policies, interfere with federal enforcement priorities in areas committed to the discretion of plaintiff United States, and otherwise impede the accomplishment and execution of the full purposes and objectives of federal law and foreign policy.

57.  Sections 4, 5, 6, and 15 of Act No. 69 violate the Supremacy Clause, and are invalid.

**SECOND CAUSE OF ACTION – PREEMPTION UNDER FEDERAL LAW**

58.  Plaintiff incorporates paragraphs 1 through 54 of the Complaint as if fully stated herein.

59.  Sections 4, 5, 6, and 15 of Act No. 69 are preempted by federal law, including 8 U.S.C. §§ 1101 *et seq.*

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, the United States of America, respectfully prays that the Court:

(1)  Declare that Sections 4, 5, 6, and 15 of Act No. 69 are invalid, null, and void;

(2)  Enter a preliminary and a permanent injunction against the State of South Carolina, and its officers, agents, and employees, prohibiting the enforcement of Sections 4, 5, 6, and 15 of Act No. 69;

(3)  Assess the costs of this litigation against the defendants; and

(4)  Grant the plaintiff such other relief as the Court deems just and proper.

Respectfully submitted,

TONY WEST
Assistant Attorney General

s/William N. Nettles
WILLIAM N. NETTLES (I.D. #6586)
United States Attorney
Wells Fargo Building
1441 Main Street Suite 500
Columbia, South Carolina 29201
Telephone:     (803) 929-3005
Facsimile:     (803) 254-2912
E-mail:           bill.nettles@usdoj.gov

BARBARA M. BOWENS (I.D. #4004)
Civil Chief

25

ARTHUR R. GOLDBERG
Assistant Director

W. SCOTT SIMPSON
Senior Trial Counsel

Attorneys, Department of Justice
Civil Division, Room 7210
Post Office Box 883
Washington, D.C. 20044
Telephone:     (202) 514-3495
Facsimile:     (202) 616-8470
E-mail:          scott.simpson@usdoj.gov

COUNSEL FOR PLAINTIFF
UNITED STATES OF AMERICA

Dated:  October 31, 2011